## EUGENE MOORE V. STATE OF NEBRASKA.

FILED FEBRUARY 17, 1898.    No. 9697.

1. **State Officers: FEES: CONSTITUTIONAL LAW.** Article 5, section 24, of the constitution, providing that the officers of the executive department "shall not receive to their own use any fees, costs, interest upon public moneys in their hands, or under their control, perquisites of office or other compensation, and all fees that may hereafter be payable by law for services performed by an officer, provided for in this article of the constitution, shall be paid in advance into the state treasury," not only prohibits such officers from receiving fees to their own use, but also prohibits all executive officers except the treasurer from receiving fees at all, and requires their payment in advance into the treasury by the persons by whom they are payable.

2. **Insurance Companies: FEES: AUDITOR OF PUBLIC ACCOUNTS.** Chapter 43, section 32, Compiled Statutes, adopted in 1873, and relating to fees paid by insurance companies for services performed for them by the auditor, was so far modified by the constitution of 1875 as to require such fees to be paid in advance into the treasury, and prohibit the auditor from receiving them.

3. **Penal Statutes: DESCRIPTION OF OFFENDERS.** When a penal statute is made to apply only to a certain class of persons, the description of the class is so far descriptive of the offense, and that the person charged is within the class is a substantive element of the crime itself.

4. **Embezzlement of Public Moneys: OFFICERS.** Section 124 of the Criminal Code, relating to embezzlement of public moneys, applies only to officers or persons charged by law with the collection, receipt, safe-keeping, transfer, or disbursement of the public moneys, and those who aid or abet such officers or persons.

5. ——: **AUDITOR OF PUBLIC ACCOUNTS.** The auditor of public accounts is not as such officer charged with the collection, receipt, safe-keeping, transfer, or disbursement of any part of the public moneys, and is therefore not within the descriptive terms of section 124 of the Criminal Code.

6. **Criminal Law: ESTOPPEL.** In order to punish one as for a crime the offense must be within the plain import of the words of the statute creating or defining the crime. An offense not within the words cannot be adjudged a crime because within the reason or spirit; and this principle cannot be evaded by holding that one performing acts which are denounced as a crime when committed by a particular class of persons is estopped from denying that he is within that class.

ERROR to the district court for Lancaster county. Tried below before CORNISH, J. *Reversed.*

The opinion contains a statement of the case.

*W. E. Reed, Barnes & Tyler,* and *Brome & Burnett,* for plaintiff in error:

On the part of plaintiff in error it is respectfully submitted: (1) That under the laws of the state he cannot be adjudged guilty of the crime of embezzlement unless the money claimed to have been embezzled by him was by him lawfully and properly received by virtue of his office; (2) that under the law of the state as it existed when this embezzlement is alleged to have occurred, and as it now exists, the auditor of public accounts was not authorized to receive, and could not lawfully collect, any fees on account of and for issuing certificates of authority or for filing annual statements of insurance companies; (3) that to comply with the law it was necessary that every insurance company desiring to file an annual statement or procure a certificate of authority to be issued to its agent or agents should pay, or cause to be paid, the fees therefor in advance into the state treasury and that having so done, no other fees could be required of any such insurance company; and that the allegation contained in the information respecting the insurance companies therein referred to, to-wit, "That each of said insurance companies having then and there fully complied with sections 20, 23, 24, and 25 of chapter 43 of the Compiled Statutes of the state of Nebraska, and all provisions of the laws of the state," is an affirmative allegation that no money or fees was at that time due from these insurance companies to the state; (4) that the state cannot invoke the doctrine of estoppel. (*Ottenstein v. Alpaugh,* 9 Neb. 237; *State v. Holcomb,* 46 Neb. 629; *Lowe v. City of Guthrie,* 44 Pac. Rep. [Okla.] 198; *Orton v. City of Lincoln,* 41 N. E. Rep. [Ill.] 159; *People v. Pennock,* 60 N. Y. 421; *San Luis Obispo County v. Farnum,* 41 Pac. Rep.

[Cal.] 445; *Hartford Fire Ins. Co. v. State*, 9 Kan. 210;
*McAleer v. State*, 46 Neb. 117; *State v. Newton*, 26 O. St.
200; *State v. Meyers*, 47 N. E. Rep. [O.] 138; *Warswick v.
State*, 35 S. W. Rep. [Tex.] 386; *State v. Bolin*, 19 S. W.
Rep. [Mo.] 650; *State v. Johnson*, 49 Ia. 141; *United States
v. Bixby*, 6 Fed. Rep. 375; 4 Lawson, Criminal Defenses.
889; *State v. Moores*, 52 Neb. 770; *State v. Lovell*, 23 Ia.
304.)

*C. J. Smyth, Attorney General*, and *Ed P. Smith, Deputy
Attorney General*, for the state:

(1.) Section 32, chapter 43, Compiled Statutes, requiring fees to be paid to the auditor, is not inconsistent
with section 24, article 5, of the constitution; hence fees
paid to him become in his hands the property of the
state. Therefore, he was an officer charged with the receipt, safe-keeping, and transfer of public moneys. (2.)
If the statute requiring payment of fees to the auditor is
unconstitutional, the fees received by him from insurance companies belonged to the state, and, under section
24, article 5, of the constitution, it was his duty as an
officer to pay such fees into the state treasury; and not
having done so, but having converted the fees to his own
use, he is guilty of embezzlement of public moneys. (3.)
If the statute requiring payment of fees to the auditor is
unconstitutional, the moneys paid to him by the insurance companies, with the intention of transferring the
title to the state, and accepted by him with the intention
of receiving the title for the state, became the property
of the state, and, under section 21, chapter 10, Compiled
Statutes, relating to liabilities of officers, he was responsible for such moneys as property of the state; and
in failing to pay the fees into the treasury and in converting the same to his own use he was guilty of the
crime charged. (4.) He is estopped to assert that he did
not receive the moneys by virtue of his office. (*Beatrice
Paper Co. v. Beloit Iron Works*, 46 Neb. 901; *Albert v.
Twohig*, 35 Neb. 563; *State v. Smith*, 35 Neb. 24; *Pleuler v.*

57

*State*, 11 Neb. 547; *Hartford Fire Ins. Co. v. State*, 9 Kan. 210; *State v. Spaulding*, 24 Kan. 1; *State v. Leidtke*, 12 Neb. 171; *Thatcher v. Adams County*, 19 Neb. 485; *Laflin v. State*, 49 Neb. 616; *State v. Wallichs*, 16 Neb. 110; *United States v. Thomas*, 15 Wall. [U. S.] 337; *Welch v. Frost*, 1 Mich. 30; *Mason v. Fractional School District*, 34 Mich. 228; *Chandler v. State*, 1 Lea [Tenn.] 296; *Phelps v. People*, 72 N. Y. 334; *Village of Olean v. King*, 116 N. Y. 355; *Swan v. State*, 48 Tex. 120; *Morris v. State*, 47 Tex. 583; *Waters v. State*, 1 Gill [Md.] 302; *Commonwealth v. City of Philadelphia*, 27 Pa. St. 497; *Mayor v. Harrison*, 30 N. J. L. 73; *Ex parte Ricord*, 11 Nev. 287; *People v. Royce*, 37 Pac. Rep. [Cal.] 630; *State v. O'Brien*, 94 Tenn. 79.)

IRVINE, C.

The information in this case, omitting formal parts, allegations of time, and venue, and other averments not material to the questions presented for review, was as follows: "That Eugene Moore, * * * then and there being an officer, to-wit, auditor of public accounts of the state of Nebraska, and as such officer being charged with the collection, receipt, safe-keeping, transfer, and disbursement of the public money and a certain part thereof belonging to the state of Nebraska, and the property of the state of Nebraska, then and there unlawfully and feloniously did fraudulently convert to his own use, and embezzle of said public money the sum of twenty-three thousand, two hundred eight dollars and five cents in money, * * * the property of the state of Nebraska, which said money had then and there come into the custody and possession of said Eugene Moore by virtue of his office as auditor of public accounts as fees from insurance companies then and there doing business in the state of Nebraska, for services to be performed by the said Eugene Moore as said auditor of public accounts in filing by the said Eugene Moore as said auditor the annual statements of said insurance companies and in issuing certificates of authority by the said Eugene Moore as

said auditor to the agents of said insurance companies," etc. The remaining averments are chiefly in the way of particularizing the services for which the money alleged to have been converted was received. To this information the defendant pleaded guilty, and then moved in arrest of judgment on the ground that the information charged no crime. The motion was overruled and the defendant sentenced to imprisonment for eight years and to pay a fine of twice the amount alleged to have been embezzled.

A suggestion made in the argument, and reflected in several places in the state's brief, is that the plea admitted the moral guilt of the defendant, and, to quote the last sentence of the brief, "having pleaded guilty to all the charges of the information, this court may well hesitate before reversing his plea, and say he is not guilty after he has said he is guilty." Surely the attorney general cannot mean to contend that because the defendant has by his plea admitted the facts charged and therefore a moral delinquency, he should be punished even if the law does not denounce those facts as a criminal offense. The question before us is not one of moral delinquency, but simply whether the facts charged in the information constitute a crime under the laws of this state. Defendant stands in no worse position in this respect than he would on a demurrer to the information, which would, for the purposes of the proceeding, involve the same admission.

While there are several different sections of the Criminal Code relating to embezzlement by different classes of persons, it is conceded that the information in this case was drawn with a view to section 124, and that it does not charge an offense against any other section. Section 124, so far as it is material, is as follows: "If any officer or other person charged with the collection, receipt, safe-keeping, transfer, or disbursement of the public money, or any part thereof, belonging to the state, or to any county or precinct, organized city or village, or

school district in this state, shall convert to his own use, or to the use of any other person or persons, body-corporate, association, or party whatever, in any way whatever, * * * any portion of the public money, or any other funds, property, bonds, securities, assets, or effects of any kind, received, controlled, or held by him for safe-keeping, transfer, or disbursement, or in any other way or manner, or for any other purpose, * * * every such act shall be deemed and held in law to be an embezzlement," etc. It will be observed that this section refers only to the embezzlement of public money or property, and that it applies only to a particular class of persons—those charged with the collection, receipt, safe-keeping, transfer, or disbursement of the public money or a part thereof. It goes almost without saying that no person is subject to the penalties of the statute unless he falls within the description of the class of persons to whom the statute is applicable. The description of the person against whom the penalty is denounced is to that extent descriptive of the offense. The allegation that the defendant was as auditor charged with the collection, receipt, safe-keeping, transfer, and disbursement of the public money is not an allegation of fact, admitted by the plea of guilty, but it is an allegation of law, and open to examination as such. We therefore address ourselves to the examination of that question. Unless the auditor, as such officer, was charged in one of the manners specified, the information fails to state an offense by failing to show that the defendant was within the class to which the statute applies.

In 1873 there was passed an act relating to insurance companies, section 32 of which was as follows: "There shall be paid by every company, association, person or persons, agent or agents, to whom this act shall apply, the following fees: For filing and examination of the first application of any company, and issuing of the certificate of license thereon, fifty dollars, which shall go to the auditor; for filing each annual statement herein re-

quired, twenty dollars; for each certificate of authority, two dollars; for each copy of paper filed as herein provided, the sum of ten cents per folio, and fifty cents for certifying the same and affixing the seal of office thereto; all of which fees shall be paid to the officer required to perform the duties." (Compiled Statutes, ch. 43, sec. 32.) It is under this section that the moneys alleged to have been embezzled were paid. In 1875 the present constitution of the state went into effect, and article 5, section 24 thereof, after fixing the salaries of the executive officers, proceeds as follows: "After the adoption of this constitution they shall not receive to their own use any fees, costs, interest upon public moneys in their hands, or under their control, perquisites of office or other compensation, and all fees that may hereafter be payable by law for services performed by an officer, provided for in this article of the constitution, shall be paid in advance into the state treasury." In our opinion this provision of the constitution so far modified the statute quoted as to require all fees for services rendered by the executive officers created by article 5 of the constitution, including, of course, fees payable by insurance companies under the statute, to be paid in advance into the treasury by the person or company by whom such fees are payable, and to prohibit the receipt thereof by the officer performing the service. It is argued that the effect of the constitution was simply to require the officer performing the services to pay the fees into the treasury, and that the statute is in necessary conflict with the constitution only in so far as it gave the fees to the officer to his own use. In this connection attention is called to section 21 of the same article of the constitution, which provides: "An account shall be kept by the officers of the executive department and of all the public institutions of the state of all moneys received or disbursed by them severally from all sources, and for every service performed, and a semi-annual report shall be made to the governor, under oath." It is said that this section plainly contemplates

the receipt by the executive officers of fees for services to be performed. The executive officers may be, and have been at times, entrusted with money by virtue of legislative appropriations, and as to them section 21 requires an account and report of such moneys. But it is said the section refers specially to fees for services performed. True, but it applies not only to the executive officers provided by the article of the constitution we are considering, but applies also to officers of all public institutions of the state, whereas section 24 is limited to the executive officers named in the first section of the article. It is only they who are prohibited from receiving fees for services performed. The legislature may in its wisdom permit officers of other state institutions to receive fees. Until 1881, the university had its own treasurer who received matriculation and other fees. Now we have a bureau charged with the inspection of oil and gasoline, and the inspectors in that bureau receive the fees fixed for the services performed by them. The provision in section 21 with reference to fees manifestly refers to fees received by those officers within the scope of section 21, and not within the prohibition of section 24. In no other way can the two sections be so construed as to give force to every part of each and create no conflict. Two former decisions of this court, *State v. Leidtke*, 12 Neb. 171, and *State v. Wallichs*, 16 Neb. 110, have some relevancy to this question, but they require more extended notice at another period of this discussion, and their effect will be considered later. Under the old constitution salaries were fixed for the various executive officers which seem parsimonious and ridiculously small even when compared with the present salaries of such officers. There was, however, no inhibition against an allowance of fees by way of further compensation, and the legislature, in imposing new duties, in several instances provided for the payment of fees to the officer as compensation for their performance. It is needless to say that this system opened the door for abuses, and section 24 of article 5

of the present constitution, having in view the vices of
the old system, sought to correct it by giving to the state
all such fees.  This object was accomplished by the first
language quoted from section 24; and if that had been
the only object in view, section 24 would certainly have
ended with the prohibition against the officers described
receiving fees to their own use.  But it was evidently
thought that a better system, and one more consonant
with the supervision and safety of public funds, could
be established by prohibiting the executive officers, other
than the treasurer, from receiving any fees at all.  It
was therefore provided that all fees for services by them
performed should be paid in advance into the treasury.
This could conveniently be required in the case of the
executive offices, because they are all maintained at the
seat of government, where the treasury is located.  Thus
no executive officer except the treasurer was charged in
any manner with the collection of fees, and their pay-
ment into the treasury was secured by requiring that
such payment should be made in advance of performing
the services.  In only one of two ways can the construc-
tion contended for by the state be supported.  One of
those demands that we should neglect altogether the
requirement that the fees shall be paid in advance; the
other is to assume that it was the intention of the consti-
tution to require an executive officer, when a service is
demanded of him, to exact payment of the fee, then act
the role of a messenger by carrying the money to the
treasurer, then return to his own office and perform the
service.  The former construction would violate the let-
ter of the constitution; the latter is too absurd to be en-
titled to serious consideration.  The rule is invoked that
before the court will hold a statute unconstitutional, a
construction will be given it in harmony with the consti-
tution, although that construction be not the most nat-
ural or obvious one.  But this is not a question of the
constitutionality of a statute.  The statute was enacted
before the present constitution took effect and was in

every respect valid when passed. The schedule of the
new constitution provides (article 16, section 1) that in
order "that no inconvenience may arise from the re-
visions and changes made in the constitution of this
state, and to carry the same into effect, it is hereby or-
dained and declared that all laws in force at the time
of the adoption of this constitution, not inconsistent
therewith, * * * shall continue," etc. Even if such
a result would not follow in the absence of that pro-
vision, it is clear that its effect was to abrogate all exist-
ing laws in so far as they were inconsistent with the
constitution. We are asked, in effect, not to give a
strained construction to a statute in order to render it
in harmony with the constitution, but to give a strained
construction to the constitution in order to prevent its
working a repeal or amendment of an antecedent statute
which happened to be in conflict with the letter and
policy of the constitution itself. The question is merely
one of an implied amendment of a statute, and the pur-
pose of the inquiry is simply to ascertain the intention of
the constitution. We have no hesitation in holding
that the intention is clearly evidenced of prohibiting the
executive officers from receiving the fees payable for
their official acts, and to require the persons paying such
fees to pay them into the treasury.

The state asserts that if that be the effect of the consti-
tution, the defendant was nevertheless charged with the
safe-keeping and transfer of these fees, he having in fact
received them. It is said that the embezzlement statute
does not require that the person charged should be
charged with the duty by statute, but that he may be
charged in any one of four ways—by the constitution,
by decisions of this court on equitable grounds, by the
common law, and by statute. It will be seen that this is
only another method of saying that he must in some way
be charged by law. Let us assume the correctness of
this analysis and see to what result it leads; for conven-
ience, however, not proceeding exactly in the order indi-.

cated.   The defendant, we have seen, was not charged
by the constitution with the safe-keeping or the transfer
of the money, but was forbidden thereby even to receive
it.   He was not charged by statute.   The statute orig-
inally gave him the money to his own use, and the consti-
tution, when it deprived him of the right to so hold it,
also took away the right to receive it.   After the consti-
tution took effect that part of the statute was as if it had
not existed, and neither its retention by the compilers in
the compilations of statutes, nor the fact that the auditor
undertook to act under it, gave it renewed vitality.   We
do not understand just what counsel mean by saying
that an officer whose office and duties are alike created
and limited by statute can be charged with the receipt,
safe-keeping, or transfer of money by the common law;
but assuming that thereby is meant that common-law
principles will be applied in ascertaining and enforcing
those duties, that subdivision becomes a part of the sec-
ond, whereby it is claimed that he may be charged by
decisions of the supreme court grounded on equitable
considerations.   The supreme court by its decisions cre-
ates no duties; it merely enforces existing duties, and by
the two heads of argument adverted to it must be meant
that a duty may arise from a consideration of the estab-
lished principles of law and equity.   So treated the
argument under this head may be analyzed into two
propositions: First, that the defendant having, although
unlawfully, received the money, it did not thereby be-
come his, but belonged thenceforth to the state, and that
it was his duty to pay it to the treasurer; secondly, that he
is estopped by the receipt of the money to deny the law-
fulness of his act or the validity of the statute where-
under he acted.

The first proposition receives, at first impression, sup-
port from the cases of *State v. Leidtke* and *State v. Wal-
lichs*, already referred to.   Both were original applica-
tions for writs of mandamus, addressed to this court,
both were submitted without briefs, and both serve to

illustrate the dangers attendant upon a hasty examination of questions presented in original cases not properly prepared by counsel and decided without the benefit of full discussion. *State v. Leidtke* was an application by the attorney general for a writ of mandamus to compel the auditor to pay into the treasury certain fees designated as "office fees," and certain fees received as were the fees in this case, together with other fees paid by life insurance companies for preparing and publishing statements. The only defense alleged in the return was that the office fees had been paid into the treasury and that the fees received from insurance companies were paid for services performed as agent for the companies and not by virtue of his duties as auditor. No suggestion was made that if the services were a part of his official duties he was entitled to retain the fees, nor was it suggested that if the fees belonged to the state mandamus was not the proper remedy, because he was not enjoined as such officer with the duty of transferring them to the treasury. On this record the court stated that the only question involved was whether the insurance fees belonged to the state or to the auditor. The court then proceeded to give the constitution the same construction which we have given it, but to decide that the auditor having received the fees he held them in trust for the state and not to his own use. With this conclusion we are satisfied, with the reservation that the state is not bound to so treat them; but it does not follow that because an officer or a private individual owes the state money or holds money in trust for the state that he is therefore charged with its receipt, safe-keeping, transfer, or disbursement. It is not to the ordinary legal obligations flowing from express or implied contracts and the duty of fulfilling them that either the law relating to mandamus or the statute with regard to embezzlement of public funds applies; and the court did not in the case referred to otherwise decide. Whether the actual question which should have been decided was the public character of the serv-

ices, as the record shows, or the ownership of the money,
as the opinion states, the question was correctly decided;
and the court was not asked to consider, and did not con-
sider, whether the payment of the money was a duty en-
joined by law upon the respondent as auditor, and one
appropriate to be enforced by mandamus.    We cannot
give any force to the case as an implied decision of that
point when the record shows that it was not in fact con-
sidered.    *State v. Wallichs, supra,* was an application by
the commissioners of Gage county to require the auditor
to register certain refunding bonds issued by that
county.    The auditor based his refusal on the fact that
he had demanded fees and that payment had been re-
fused.    As already said, there are no briefs in the case,
but an inspection of the opinion discloses that the county
contended it had the right to have the bonds registered
free of expense.    A statute passed prior to the adoption
of the constitution provided that "the auditor shall be
entitled to a fee    *    *    *    for each bond so registered,
to be paid by the holder thereof."    (Session Laws 1875, p.
170, sec. 3.)    The court said that this statute had not
been repealed, but, citing *State v. Leidtke,* that such fees
are not for the use of the auditor, but it is nevertheless
his duty to collect them.    If *State v. Leidtke* was to be
followed as holding that they must be turned in by the
auditor to the treasury—a question not involved in the
*Wallichs Case*—the court should not have overlooked the
other statement in the *Leidtke Case* that the fees should
be paid into the treasury in advance, the treasurer giving
proper vouchers therefor.    Here again the only question
really decided was that the fees must be paid; that the
county was for that purpose to be deemed the holder of
the bonds.    No fees had been tendered either auditor or
treasurer; so that whether they should be paid to the
treasurer or auditor the writ had in either case to be de-
nied, and the remark of the court as to the duty of the
auditor to collect them was purely *obiter.*    We must
decline to accept either case as authority for the propo-

sition that this court has established a law imposing on the auditor a duty in conflict with the constitution.

That where an officer receives money which he is not by law authorized to receive, such money is not received by him in his official capacity, and that any duty which he may owe of paying the money is only that which rests upon any debtor or bailee, is established by many cases.

*San Luis Obispo County v. Farnum*, 108 Cal. 562, was an action on the bond of a county auditor to whom a tax collector had paid money which should have gone to the treasurer. The court said: "That the money in question, having been collected by the tax collector for licenses, belonged to the county is not questioned; but that it came to the hands of the defendant Farnum as auditor is a conclusion of law wholly unsupported by the facts found. * * * Having received the money, it was Farnum's duty to pay it over to the treasurer; but such duty did not arise out of his office, nor was it at all different from the duty which would have rested upon him to pay it over had he been a plain citizen not holding any county office." (See also *People v. Pennock*, 60 N. Y. 421; *Orton v. City of Lincoln*, 41 N. E. Rep. [Ill.] 159; *Lowe v. City of Guthrie*, 44 Pac. Rep. [Okla.] 198; *Warswick v. State*, 35 S. W. Rep. [Tex.] 386; *State v. Johnson*, 49 Ia. 141; *People v. Cobb*, 51 Pac. Rep. [Colo.] 523; *People v. Hilton*, 36 Fed. Rep. 172; *Rex v. Thorley*, Moody C. C. [Eng.] 343; *State v. Moeller*, 48 Mo. 331; *Rex v. Hawtin*, 7 C. & P. [Eng.] 281.)

A case very similar arose in Kansas, the question there being whether a certificate issued to an insurance company was valid where the auditor had made a draft for the money, then issued the certificate, and, after the proceeds of the draft were received, paid the money into the treasury. The court held that the certificate was void, saying: "The much more serious error is found in the declaration that the auditor acted as the agent of the state in drawing the draft, or in receiving the money when it was paid. The limits of an officer's authority are

found in the law.   *   *   *   If the corporation chose to pay this through the auditor, then for that purpose the auditor was the agent of the corporation and not of the state." (*Hartford Fire Ins. Co. v. State*, 9 Kan. 210.) It is asserted that a distinction exists between that case and the present, in that the law of Kansas made the payment of the money into the treasury a condition precedent to the performing of the services. The language of the statute there was: "Before the auditor shall issue any certificate of authority   *   *   .*   there shall be paid into the state treasury by the corporation," etc. Our constitution says that the fees shall be paid into the treasury in advance. We can see no difference. To pay in advance means precisely the same as to pay before the services are rendered. We are not unmindful that the Kansas court, in *State v. Spaulding*, 24 Kan. 1, sustained a conviction of embezzlement where a city clerk by custom had received certain license moneys which should properly, under an ordinance, have been paid to another officer. While there is some language in the opinion indicating that the court deemed a principle of estoppel applicable, the conviction was sustained under a count charging the receipt of the money by the defendant as an agent of the city and not as clerk, the court holding that while its receipt was no part of his official duties, there was nothing to prevent the city by custom from appointing an agent for that purpose, and that he was to be deemed such agent. The court cited *State v. Heath*, 8 Mo. App. 99, which was afterwards reversed by the supreme court (70 Mo. 565), and where the conviction was in a like case sustained on the ground of agency, but not on the ground of official station or duty, there being counts charging the offense in each manner.

The statute of Ohio was precisely like ours with reference to embezzlement of public funds, and the supreme court of that state held that it did not extend to a county auditor because he was not as such charged with the collection and receipt of money. (*State v. Newton*, 26 O. St.

265.) In a later case, but after some amendments of the statute not material to the present inquiry, it was held that a deputy treasurer was not within its provisions. (*State v. Meyers*, 47 N. E. Rep. [O.] 138.) These cases are precisely in point. The distinction urged by the state, that in Ohio there was no law, valid or invalid, authorizing the officer to receive the money, does not exist, but in effect concedes away the conviction here, because after a law has been repealed it no longer exists so as to impose future duties or confer future rights. *State v. Bolin*, 19 S. W. Rep. [Mo.] 650, is another case in point.

Nor do we think that there is any principle of estoppel whereby the defendant is forbidden to deny that he is within the class against which the penalties of the statute are denounced. For the purposes of this case we need not inquire whether the same rules apply as to estoppel in civil and in criminal cases, or whether a man may ever be estopped to plead the law. The cases cited as applying estoppels are for the most part cases where an officer charged by law with the duty of collecting taxes has actually collected them and then refused to turn them over because illegally levied. There the general duty of collecting the money was imposed by law on the officer. The money was paid. The legality of the tax was a question solely between the public and the taxpayer, and the latter having voluntarily paid the tax, it was no affair of the collector whether he might have resisted the payment or not. The matter was not one of an estoppel. The issue was merely immaterial. No one could defend a charge of embezzlement as the agent of an individual, on the ground that a third person had paid money which he did not owe and could not have been compelled to pay; but there is a multitude of cases holding that he may defend if he had no authority to receive payment at all. Akin to these cases are those where a foreign corporation is prohibited from doing business except on compliance with certain requirements, and an agent embezzles its funds, and alleges in defense that the princi-

pal had no right to make the contracts leading to the collection of the money. This is really a case of an immaterial issue, or if it be one of estoppel, it is an estoppel to deny the facts giving the principal a right to do business. Where a criminal statute applies only to persons of a certain class, the doing of the acts which the statute forbids does not estop the defendant from denying that he belongs to the class which is alone subjected to the penalties. Yet that is at the last analysis the argument of the state on this branch. A statute of this state makes it rape for a male person of the age of eighteen or upwards to carnally know a female child under the age of eighteen. Should it appear that a man had so carnally known a female child, he would not by that fact be estopped from asserting that he was himself under the age of eighteen. The description of the persons in such statutes is a substantive element of the crime, and devolves upon the state to prove that the defendant is within the class punishable. In *State v. Meyers, supra,* the court, speaking of a statute essentially like this, said that a statute defining a crime cannot be extended by construction to persons or things not within its descriptive terms, although they appear to be within the spirit and reason of the statute. In *State v. Lovell,* 23 Ia. 304, Judge Dillon, after confessing that the criminal jurisprudence of this country is blemished with over-technical niceties, said: "But the faults of the common-law tribunals in this regard are more than redeemed by their stern determination not to admit or create constructive crimes. This is among their noblest monuments." And Chief Justice Marshall said in *United States v. Wiltberger,* 5 Wheat. 76, "To determine a case is within the intention of a statute, its language must authorize us to say so. It would be dangerous, indeed, to carry the principle, that a case which is within the reason or mischief of a statute is within its provisions, so far as to punish a crime not enumerated in the statute, because it is of equal atrocity, or of a kindred character, with those which are enu-

merated. If this principle has ever been recognized in expounding criminal law, it has been in cases of considerable irritation, which it would be unsafe to consider as precedents forming a general rule for other cases." The remark about "cases of considerable irritation" is aptly characteristic, we think, of the few cases called to our attention invoking principles of estoppel to prevent a man's defending on the ground that there is no law to convict him. It is precisely those cases of "considerable irritation" in which the courts should be particularly careful that the bulwarks of liberty are not overthrown, in order to reach an offender who is, but who perhaps ought not to be, sheltered behind them. The principle announced in the last cases cited is incorporated into the Criminal Code in order that the courts may not possibly depart from it. Section 251 provides that "no person shall be punished for an offense which is not made penal by the plain import of the words, upon pretense that he has offended against its spirit." To hold that the auditor is a person charged with the collection, receipt, safekeeping, transfer, or disbursement of the public money, when the law expressly forbids him to receive it or handle it, would certainly go beyond the plain import of the words of the statute, and create a crime by construction in the plainest violation of the law.

REVERSED AND DISMISSED.

SULLIVAN, J., dissenting.

I do not concur in the conclusion of the majority and give here the reasons for my dissent.

The constitution of 1875 not only repealed that part of section 32 of the insurance law which authorized the auditor to appropriate to his own use the fees therein specified, but repealed, as well, so much of the section as authorized him to receive such fees for any purpose. These fees were, by the provisions of the constitution, required to be paid into the treasury of the state in ad-

vance of the rendition of the service which the statute made it the auditor's duty to perform. The money then, it must be conceded, was received without authority of law. Being so received, is the defendant guilty of embezzlement under section 124 of the Criminal Code, by reason of having converted it to his own use? Resolved into its elements the proposition is this: (1) Did this money belong to the state, and (2) does the defendant fall within the class of persons against whom the penalties of the section are denounced?

It is settled by a long line of decisions in other states that taxes or other public revenues collected by an officer acting under color of an unconstitutional law or void ordinance belong not to himself, but to the municipal or political corporation whose commission he bears. (*Chandler v. State*, 1 Lea [Tenn.] 296; *Village of Olean v. King*, 116 N. Y. 355; *Swan v. State*, 48 Tex. 120; *Morris v. State*, 47 Tex. 583; *Waters v. State*, 1 Gill [Md.] 302; *Commonwealth v. City of Philadelphia*, 27 Pa. St. 497; *Middleton v. State*, 120 Ind. 166; *Mayor v. Harrison*, 30 N. J. L. 73.) Here the defendant, acting under color of a statute originally valid, but repealed in part by implication on the adoption of the present constitution, collected fees due the state for official services rendered by him as auditor of public accounts; and now, after having rendered services to the insurance companies as the agent of the state, and after having assumed to act for the state in collecting the fees due for such services, he cannot be heard to deny that the fees so collected and received belong to, and are the property of, the state. The application of the doctrine of estoppel to the facts in this case has made the money in question the money of the state; and it must be so regarded whether its title be drawn in question in a civil or in a criminal case. The law does not require us to hold to-day in a criminal action that it is not the state's money, and to-morrow in a civil action that it is. In the case of *State v. Spaulding*, 24 Kan. 1, it was held that where a city officer, pursuant to a custom

58

of long standing, but without any other color of right,
collected fees due to the city for services rendered by him,
such fees belonged to the city, and that by their appro-
priation to his own use he was guilty of embezzlement.

But was the defendant one of the persons against
whom section 124 of the Criminal Code is directed?
Whatever may be the rule in other jurisdictions, the
question is no longer an open one in this state. It has
been effectually set at rest by the decision in the case of
*State v. Leidtke*, 12 Neb. 171. The language of the section,
"any officer or other person charged with the collection,
receipt, safe-keeping, transfer, or disbursement of the
public money," etc. (Criminal Code, sec. 124), is, unques-
tionably, descriptive of the persons who may be punished
under its provisions, and is, therefore, descriptive of the
offense. It is, of course, true that the defendant was not
charged by any valid law with the collection or receipt
of the moneys here in question, but having collected and
received them under color of his office, it became his duty
to safely keep them and transfer them to the treasury of
the state. And this was not, as intimated in the case of
*San Luis Obispo County v. Farnam*, 108 Cal. 562, 41 Pac.
Rep. 445, a duty due from him as a private citizen, but one
arising out of, and resulting from, his official station.
Upon this point the *Leidtke Case* is direct authority; for,
by the judgment of this court, a peremptory writ of man-
damus was awarded against Leidtke to compel him to pay
to the state treasurer fees collected by him as auditor un-
der the provisions of section 32 aforesaid. The writ could
not have issued against him as a mere private debtor of
the state. It could have issued only to coerce the perform-
ance of an official duty. (*Thatcher v. Adams County*, 19
Neb. 485; *Laflin v. State*, 49 Neb. 614.)

I am not prepared to say that I should agree to the rule
established by the *Leidtke Case* were the question now
presented for the first time. But that decision has stood
unchallenged for nearly twenty years. It may be con-
trary to the weight of authority, but it has the support of

sound reason; and, to say the least, it is not so serious an impediment in the way of justice as to call for a judicial repeal.  The principle on which it rests has the sanction of very eminent authority.  It is precisely the same principle which controlled the decision in the case of *State v. Spaulding, supra.*  In that case the conviction was not sustained because Spaulding was agent of the city to collect license moneys.  In truth he was not, and could not have been, such agent,—an exclusive agency for that purpose was, by ordinance, vested in the city treasurer; but having by an assumption of authority obtained the money which he embezzled, he was estopped from denying that such assumption was false.  From the opinion written by Brewer, J., now of the supreme court of the United States, I quote as follows: "We do not affirm that the city was concluded by the defendant's acts, nor indeed that any one is estopped but himself.  But we hold that when one assumes to act as agent for another, he may not, when challenged for those acts, deny his agency; that he is estopped not merely as against his assumed principal, but also against the state; that one who is agent enough to receive money is agent enough to be punished for embezzling it.  An agency *de facto,* an actual even though not a legal employment, is sufficient.  The language of the statute is, 'If any officer, agent, clerk, or servant of any corporation, or any person employed in such capacity.'  *  *  *  He [the defendant] voluntarily assumed full charge of this entire matter, including the receipt of the money and the issue of the license. The money was paid to him because of his office and to induce his official action, and he may not now say that it was not received 'by virtue of his employment or office,' or that its receipt was not one of the prescribed legal duties of such office.  *  *  *  He may not enter into the employment and then deny its terms or responsibilities.  He is estopped from saying that this money which he embezzled is not the money of the city."  It is no more true as a legal proposition that Spaulding was the agent

of the city, or, in the language of the Kansas statute, "employed in such capacity," than it is that the defendant in this case was "charged with the collection, receipt, safe-keeping, transfer, or disbursement of the public money." Nevertheless, he was convicted and the conviction sustained because the law did not permit him to assert the truth and rely on it as a defense. So it seems to me that the defendant Moore, having obtained the money in question for the state by the exertion of his official authority, should not be permitted to deny that he held it in his official capacity. The remarks of Mr. Bishop in his work on criminal law are pertinent here. The author says: "In reason, whenever a man claims to be a servant while getting into his possession the property to be embezzled, he should be held to be such on his trial for the embezzlement. This proposition is not made without considering what may be said against it. And a natural objection to it is that when a statute creates an offense which by its words can be committed only by a 'servant,' an extension of its penalties to one who is not but only claims to be such, violates the sound rule of statutory interpretation whereby the words, taken against defendants, must be construed strictly. But why should not the rule of estoppel, known throughout the entire civil department of our jurisprudence, apply equally in the criminal? If it is applied here, then it settles the question; for by it when a man has received a thing of another under the claim of agency, he cannot turn around and tell the principal, asking for the thing: 'Sir, I was not your agent in taking it, but a deceiver and a scoundrel.' When, thereafter, the principal calls the man under these circumstances to account, he is estopped to deny the agency he professed, why also, if he is then indicted for not accounting, should he not be equally estopped on his trial upon the indictment?" (2 Bishop, Criminal Law [7th ed.], ch. 16, sec. 364.) The rule thus stated has been recognized and approved in *State v. Spaulding, supra, State v. O'Brien*, 94 Tenn. 79, and *People*

*v. Royce*, 106 Cal. 173, 37 Pac. Rep. 630.    It has also received recent recognition from this court.    In the case of *Bartley v. State*, 53 Neb. 310, the contention of the defendant that the depository act is unconstitutional is answered in the following language: "It is urged that the court erred in assuming in the tenth, eleventh, and fifteenth paragraphs of the charge the validity of the depository law.    An elaborate argument is made in the briefs against the validity of that piece of legislation on grounds other than those heretofore considered by this court.    We must be excused from entering upon a discussion of the subject at this time, as the defendant is in no position now to assert that the public moneys of the state were not rightfully on deposit in the Omaha National Bank.    He recognized the validity of the statute by placing the moneys of the state in said bank, and it would indeed be a reproach upon the law to permit him to assail the depository law in a prosecution for the embezzlement of the public funds so deposited by him. It was the money of the state that went into the bank, and it was likewise the money of the state that paid the check, whether the bank was a lawful state depository or not."    From these citations it appears that the *Leidtke Case* does not stand solitary and alone.    The principle on which it was decided is not a pernicious one, to say the least, and it should, in my judgment, be adhered to.    The defendant, by his plea of guilty, has confessed that he received the money embezzled as auditor of public accounts, and I do not think we should either directly or by necessary implication overturn one of our own decisions in order to hold that his confession is false.