## No. 14,528.

## Rogers *v.* The People.

(94 P. [2d] 594)

Decided July 3, 1939.   Rehearing denied September 11, 1939.

Mr. GEORGE H. LERG, Mr. E. V. HOLLAND, for plaintiff in error.

Mr. BYRON G. ROGERS, Attorney General, Mr. REID WILLIAMS, Assistant, for the people.

*En Banc.*

MR. JUSTICE BURKE delivered the opinion of the court.

PLAINTIFF in error, a county commissioner, hereinafter referred to as defendant, or Rogers, was indicted for the illegal use of public funds, convicted and sentenced to the penitentiary for a term of six to ten years. To review that judgment he prosecutes this writ and asks that it be made a supersedeas. We elected to finally dispose of the cause on the application. It has accordingly been fully briefed and orally argued.

The statute under which the indictment was returned reads: ''If any officer appointed or elected by virtue of the constitution of this state, or any law thereof, as an officer, agent or servant of an incorporated city, town, municipal township, school district, or county, or other

subdivision of this state, shall convert to his own use in any way whatever, or shall use, by way of investment in any kind of property or merchandise, or shall make way with or secrete any portion of the public funds or moneys, or any valuable securities by him received for safekeeping, disbursement, transfer, or for any other purpose, or which may be in his possession or over which he may have the supervision, care or control, by virtue of his office, agency or service, or under color or pretense thereof, every such officer, agent or servant shall, upon conviction, be punished by imprisonment not less than five (5) years." '35 C. S. A., vol. 2, p. 1051, c. 48, § 262.

The count of the indictment under which defendant was convicted reads: "That I. B. Rogers, late of the county of Las Animas and state of Colorado, then and there being a duly elected officer of said Las Animas County, to-wit, a duly elected, qualified and acting county commissioner in and for said Las Animas county, which said county is a quasi public corporation duly organized, existing and doing business under and by virtue of the laws of the state of Colorado at and within the said county of Las Animas did on or about the 25th day of November, 1936, knowingly, willfully, unlawfully, corruptly, feloniously, falsely, fraudulently and designedly use, secrete and convert to his own personal use the sum of $200.00 lawful money of the United States of America and being a portion of the public funds or moneys of said Las Animas county, in this, to-wit:

"That on or about the 25th day of November, 1936, Chas. B. Gerardi presented to said Las Animas county a certain claim, account and voucher for payment by said Las Animas county, which said account, claim and voucher was presented to said Las Animas county as a just and true account of the indebtedness of said county to said Chas. B. Gerardi for one steam boiler, radiators and fittings complete, to be delivered to Las Animas county; that said I. B. Rogers as such county commissioner aforesaid, allowed and approved said claim and

caused the same to be paid from the public funds of said county of Las Animas; that said I. B. Rogers then and there well knew that in truth and in fact that the said steam boiler, radiators and fittings complete to be delivered to said Las Animas county amounted to, and was of the reasonable value of not more than $1000.00, and that said Las Animas county was not indebted to said Chas. B. Gerardi in the amount of $1200.00 as claimed and asserted in the said claim, account and voucher, for the reason that the value and amount by which said county was indebted to said Chas. B. Gerardi was not more than $1000.00; that the said I. B. Rogers then and there did, knowingly, willfully, unlawfully, corruptly, feloniously, falsely, fraudulently and designedly procure, receive, secrete, use and convert $200.00 of said $1200.00 to his own use.''

On the trial ample evidence was produced of the following facts, which were presumably found by the jury: The county needed a heating plant. One Gerardi owned such. It was second hand and he offered it through Rogers for $1000. The latter inquired if it would stand $1200. Gerardi replied, in substance, that it would stand whatever defendant said. They thereupon agreed that it should be sold to the county for the fictitious price of $1200 of which Rogers was to have $200. Rogers caused a voucher to be drawn and presented for that amount, and, acting for the board in the matter, he allowed, or voted for the allowance of, the claim, and signed the warrant. Gerardi cashed it and paid Rogers the $200. It was the practice of the board to parcel out certain of its duties among its members, particularly assigning to each the necessary purchases for his district. Rarely were debts thus contracted turned down by the board. Thus Rogers represented the board in this purchase. From a cursory examination of this record it would therefore appear to present a pretty clear case of guilt and lawful conviction. But by his assignments Rogers says, in substance: The indictment under which I was tried was returned by an

illegal grand jury; before that body I was forced to testify against myself; I was wrongfully denied a change of judge; my guilt of unlawful conspiracy, or of obtaining money under false pretenses, may have been sufficiently established by the evidence, but not guilt of violating this statute; the indictment charged no offense; the evidence did not conform to the charge; evidence of other alleged similar offenses was improperly received; the judge made a prejudicial remark in the presence of the jury; certain erroneous instructions were given; certain tendered instructions were improperly refused; and certain evidence was improperly admitted and excluded: For all or any of these reasons reversible error was committed and I did not have a fair trial.

1. The grand jury was summoned on open venire. Defendant contends that under the circumstances it could only be drawn from the box. The statute provides that ''at least thirty days prior to the term'' the clerk shall draw from the box ''a sufficient number of grand and petit jurors for the next term.'' '35 C. S. A., c. 95, § 13. ''In drawing the list of jurors for the first panel of any term of court, the court shall select from the first thirty names thereon, or from such lesser number as may be called to serve as jurors, the names of twelve persons who shall constitute the grand jury in case a grand jury is required.'' Sec. 59, id. It will be observed that the foregoing is only applicable ''in case a grand jury is required,'' and that it is then selected from ''the first panel.'' In counties like Las Animas the calling of a grand jury is discretionary with the judge. It often happens that when the first panel is drawn (as was the case here), or when the term opens, no grand jury has been ordered or decided upon. Hence we have held such acts directory only, and that grand jurors can nevertheless be summoned by open venire as under the common law. *Imboden v. People,* 40 Colo. 142, 151, 90 Pac. 608. Moreover, this term opened May 9. On April 8 a panel of 36 petit jurors was ordered drawn and summoned for

service May 16th. The district attorney on May 9, the opening day, petitioned for a grand jury and it was so ordered that day, on open venire, to report May 12. If the court may order an open venire for a grand jury "during the term" it is immaterial that this be done on the first day of the term or the third. Again, in certain contingencies, including "if jurors shall not be drawn and summoned as herein provided, * * * the court shall, nevertheless, have power to cause a jury to be summoned by open venire." It is clear that this language relates to grand as well as petit jurors. '35 C. S. A., c. 96, § 17. This record shows a finding by the trial judge that on the date when the petit jury was called he had formed no conclusion as to the calling of a grand jury and that no statements relative thereto were made by him until after the presentation of the petition by the district attorney. Moreover, it would seem that such technical questions as that here raised are disposed of by another section of our statute: "* * * No motion in arrest of judgment or writ of error shall be sustained * * * by reason of the disqualification of any grand juror or grand jurors * * *." '35 C. S. A., c. 48, § 453.

■■ 2. Defendant, in his motion to quash, which was overruled, says he was "required by authority of the grand jury to appear before it" and "was thereby compelled to be a witness involuntarily against himself." It will be observed that the allegation is so adroitly worded as to be a mere statement of defendant's conclusions. What testimony was called for or given is not indicated. No fact is stated from which we may determine that it was "by authority," or that he was "compelled," or that his testimony was "against himself." On the hearing of the motion it was admitted that when defendant was before the grand jury the proper warning was given him. The district attorney then asked permission to show "that it was at defendant's request he appeared before the grand jury." To this offer his counsel replied, "I will certainly object to that. * * * It

makes no difference ·* * * how he got before the grand jury. It makes no difference, the fact he was warned before being sworn as a witness." The record does not disclose a formal overruling of the objection, but the equivalent thereof is the court's order to "proceed with the argument." In other words defendant's position is that one whose conduct is under investigation may rush to the grand jury room, demand to be heard, ignore all warnings, and if he be sworn and permitted to open his mouth he is thereby forever absolved of his offense. To state the proposition is to refute it. Defendant relies principally on *Tuttle v. People,* 33 Colo. 243, 79 Pac. 1035. In the Tuttle case the defendant was subpoenaed, was not represented by counsel, was not warned, and had no information that he might refuse to testify. In the beginning that opinion makes it clear that the real question is, Was the evidence given voluntarily? The authorities are not in accord as to when such evidence is given voluntarily and when involuntarily. Surrounding facts and circumstances receive a different interpretation in different jurisdictions. They sometimes dispense with the issuance of a subpoena, sometimes with the administration of an oath, and sometimes disregard an insufficient warning, but always the finding of "involuntary" rests upon something which, time, place, circumstances, or individual considered, would be equivalent to some measure of compulsion. None of these appear in the instant case. The admitted facts, plus the offer excluded in compliance with defendant's objection, present a case of voluntary testimony if ever man testified before a grand jury voluntarily.

3. A motion for change of judge was denied. If this was error it was cured when the trial judge thereafter disqualified himself and called in another.

4. Defendant's claims that he was prosecuted under the wrong statute, was guilty under some other, if at all, and that there was a variance between charge and proof, we consider together. Let it be first observed

that proof of a crime often necessarily includes proof of a conspiracy to commit it and that, in countless ways, proof of guilt of a violation of the act in question might necessarily involve proof of guilt of obtaining money under false pretenses. Yet there is no mandate compelling prosecution for these connected crimes. That discretion is vested in counsel for the people. Such a situation, the facts already stated show, probably existed here.

This statute is about as remote from a literary masterpiece as any known to us, yet its purpose and intent are not particularly obscure. Deleting all portions of even questionable application to this defendant and his offense it reads: "If any officer * * * of [a] county * * * shall convert to his own use in any way whatever * * * or shall make way with * * * any portion of the public funds * * * over which he may have the supervision, care or control, by virtue of his office * * * or under color or pretense thereof, every such officer * * * shall, upon conviction be punished by imprisonment not less than five (5) years." It is said that defendant was not the custodian of the money in question and that he had no exclusive control over it. The statute does not so require. It is said that it was Gerardi's money and defendant got it from him. But one doesn't get title to property by theft or by criminal conspiracy, or fraud equivalent thereto. This money belonged to Las Animas county. In an indirect way defendant obtained it and converted it to his own use. Under the law he had joint supervision over it. Under the practice of his board probably complete supervision. This supervision, care or control was by virtue of his office. If not strictly so it was at least under color or pretense thereof. That the scheme by which he possessed himself of it involved diverting it to his own pocket by the way of the pocket of Gerardi, his agent, coconspirator, or accomplice, avails him nothing. If under color of his office he got it out of the public treasury and sent it around the world through

602

a thousand hands before he got his own fingers on it, his offense would be the same. *State v. Krug,* 12 Wash. 288, 41 Pac. 126. In oral argument counsel for defendant insisted that their position on the question was supported by *Wright v. People,* 104 Colo. 335, 91 P. (2d) 499, wherein we construed this statute. We think not. Whether Wright was "an officer" we left undecided. If he was not, the statute had no application. There the money in question was private funds, here public. There Wright's action was not "by virtue of his office," if he was an officer, nor even "under color or pretense thereof." Here, to say the least, Rogers acted "under pretense" of his office. Clearly, therefore, Wright was not within the statute, Rogers was.

5. Some ten assignments are based upon erroneous admissions of evidence of other offenses. This consisted principally of county warrants, shown to be in part fraudulent, used for the same purpose as the warrant in question, and to which Rogers bore substantially the same relation. This evidence was admissible under the familiar rule applicable to proof of intent, plan or design. *Bruno v. People,* 67 Colo. 146, 186 Pac. 718. It should be borne in mind that here defendant claimed, and his counsel vehemently argues, that this $200 was a mere innocent "overcharge," with no taint of criminality. It was therefore proper to peep into other similar transactions to test that claim. In the Bruno case, supra, defendant was convicted of importing intoxicating liquor. It was consigned and delivered to him as "salad oil." He claimed it was intended for another firm and had been ordered by his brother. The state, to rebut this by "similar transactions" offered certain "salad oil" boxes received by him at the station and found at his home. They were, however, empty. We held that, assuming they had been filled as the one in question, they were admissible under the rule; assuming they had not their admission was without prejudice. Here the warrants objected to were not empty, but were shown to be filled with the

same "salad oil" as that issued to Gerardi. The evidence was admissible on reason and precedent.

6. On cross examination the witness Gerardi was asked if he had once attempted to overcharge the Elks club in a transaction which had nothing to do with the questions here in issue. The interrogatory was inexcusable. The district attorney objected to it, insisted that this and similar ones were propounded for the purpose of prejudice, and asked a ruling accordingly. On its face this carries that impression. In sustaining the objection the judge said: "It is immaterial here what crooked deals this witness may have had with others * * * I do not care how many crooked deals he and the defendant here or others, may have had, so long as it does not relate to this particular transaction." The objection is trivial. The words "and the defendant here" were doubtless ill-advised, but the remark was casual, was not so couched as to especially reflect upon defendant, was inspired by the attempt of defendant's own counsel to inject prejudicial matter into the record, and in fact reflected more strongly on the state's principal witness than on defendant. Either side could complain of it with equal reason. If error there was no prejudice.

7. The only serious objections raised as to instructions given and refused, and evidence admitted and excluded, are so related to questions hereinbefore disposed of that they deserve no separate examination. Other minor questions are, for the same reason, unnoticed, and much argument clearly outside the record, and numerous conclusions unsupported thereby, have necessarily received the same treatment.

Finding no reversible error in this record the judgment is affirmed.

MR. JUSTICE FRANCIS E. BOUCK not participating.

MR. CHIEF JUSTICE HILLIARD dissents.

MR. JUSTICE BOCK concurs in the conclusion.

604

Mr. Chief Justice Hilliard dissenting.

Although I am not satisfied that other points urged by plaintiff in error have been rightly resolved, I comment only upon his contentions: (1) That section 262, chapter 48, '35 C. S. A., under which the prosecution proceeded, is without application to county commissioners or to their acts in relation to the discharge of their duties; and, (2) that a remark of the court during the trial was materially prejudicial. The statute and indictment are quoted in the opening of the court opinion.

1. County commissioners, three for each county, are constitutional officers. Art. XIV, § 6, Constitution; *Robbins v. Board of Commissioners*, 50 Colo. 610, 115 Pac. 526. The board of county commissioners is the auditing authority of a county. '35 C. S. A., c. 45, § 44; *Board of Commissioners v. Bloom*, 14 Colo. App. 187, 59 Pac. 417; *Gregg v. Board of Commissioners*, 32 Colo. 357, 76 Pac. 376. "To bind the county, or to make their doings legal, they [county commissioners] must act, not individually, or separately, but collectively as a board." *Robbins v. Board of Commissioners, supra.* See, also, *People ex rel. v. Carver*, 5 Colo. App. 156, 38 Pac. 332.

The statute in question is in form similar to corresponding legislation of many states. In no jurisdiction, as my study convinces, has it been held that the act applies to auditing officers, or to any official not having the "actual corporeal possession, control or custody of the thing sought to be transferred or disbursed." *In re Huston*, 27 Idaho 231, 147 Pac. 1064. The Idaho court cites and reviews many decisions from other jurisdictions, all holding to the effect that the act is "particularly pointed at treasurers—state, county, township, city—and other officers whose duties are similar, and not at auditors." *State v. Newton*, 26 Ohio St. 265. To bring an official within the purview of the statute, it must appear that the money in question came into his possession pursuant to some law, and by virtue of his office. *State v.*

*Newton, supra.* The Ohio decision points out the whys and wherefores of the statute, and how it applies exclusively to treasurers or other immediate custodians of public funds. In *State v. Hall,* 126 Mo. 585, 29 S. W. 582, the Supreme Court of Missouri discussed an indictment based on a like statute, and in which it was charged that a "city marshal, and, as such, ex officio collector of the city of Odessa, * * * then and there * * * intrusted with and having the care, custody and control * * * of the said public moneys * * *, by him received and taken into his possession and custody by virtue of his said office for safekeeping * * *, did then and there unlawfully, fraudulently and feloniously embezzle, make away with, secrete and convert to his own use," etc. Determining that defendant there was not authorized to have "possession or control of the city moneys as marshal and ex officio collector," the court held that the indictment was properly quashed. See, also, *State v. Bolin,* 101 Mo. 209. In *Moore v. State,* 53 Neb. 831, 74 N. W. 319, defendant, state auditor, was indicted under a similar statute, and charged with having received and made away with a sum in excess of twenty thousand dollars which he had assumed to collect by virtue of his office. He pleaded guilty, "and then moved in arrest of judgment on the ground that the information charged no crime." The trial court's adverse resolution on the motion was reversed by the Nebraska Supreme Court, on the ground that the auditor did not become possessed of the funds by virtue of his office pursuant to law. "To hold that the auditor," the court said, "is a person charged with the collection, receipt, safekeeping, transfer, or disbursement of the public money, when the law expressly forbids him to receive it or handle it, would certainly go beyond the plain import of the words of the statute, and create a crime by construction in the plainest violation of the law." This case, and those from Idaho and Ohio already mentioned, treat of the philosophy of the statute in question at length, give lexicographic defi-

nitions, and cite and review many decisions. See, also, 1 Bouvier (Rawle's 3d Rev.), title Embezzlement, pp. 1004-1006.

Considering the genesis of the legislation and the unanimity of decision on the point, I cannot think the statute on which the prosecution places reliance is applicable to the charge against plaintiff in error. The intent of the enactment is clear, the wording unambiguous, and, as I believe, its sole purpose was to simplify prosecutions of those charged with the misuse of funds lawfully coming into their manual possession. "Where there is no ambiguity in the words, there is no room for construction. The case must be a strong one indeed, which would justify a court in departing from the plain meaning of words, especially in a penal act, in search of an intention which the words themselves did not suggest. To determine that a case is within the intention of a statute, its language must authorize us to say so. It would be dangerous, indeed, to carry the principle, that a case which is within the reason or mischief of a statute, is within its provisions, so far as to punish a crime not enumerated in the statute, because it is of equal atrocity, or of kindred character, with those which are enumerated. If this principle has ever been recognized in expounding criminal law, it has been in cases of considerable irritation, which it would be unsafe to consider as precedents forming a general rule for other cases." Chief Justice Marshall, speaking for the court, in *United States v. Wiltberger,* 4 U. S. 574 (5 Wheat. 76), 18-21 L. Ed. 37. "Criminal statutes are, to adopt a word very happily used by Mr. Bishop, *inelastic,* and cannot by construction be made to embrace cases plainly without the letter though within the reason and policy of the law." *State v. Lovell,* 23 Iowa 304. The case of *Wright v. People,* 104 Colo. 335, 91 P. (2d) 499 (decided since the trial of this case), discounted in the court opinion here, was based upon the section of the statute involved in this prosecution. For the purpose of the decision there (opinion by Mr. Justice

Bock) we proceeded on the theory that Wright "was an officer or agent within the meaning" of that section, which "charges an offense in the nature of embezzlement," as said in the opinion. "One of the elements [of embezzlement]," continued Mr. Justice Bock, "is 'that the accused occupied the designated fiduciary relation, and that the property came into his possession by virtue of his employment or office.'" The judgment of conviction against Wright was reversed and his discharge ordered. In nothing essential, as I conceive, is that case distinguishable from the one under review; and, as I have already emphasized, since the accused here did not, and from the nature of his office as fixed by statute, could not, lawfully possess public funds of the county, the charge of "an offense in the nature of embezzlement," does not lie against him. That the legislative department only intended to cover situations where governmental agencies were despoiled of their funds by public officials having lawful and immediate custody thereof, unmistakably appears from the title of the enactment. It reads: "An act to prohibit the conversion, loaning or deposit for the benefit of officers, agents, and servants of public funds belonging to the counties, cities, towns, townships and school districts of the state, and to provide punishment * * *." Laws 1889, p. 297. From the nature of things, as I think, nothing inhibited by the statute is possible of accomplishment other than by an official in lawful possession of public funds. Indeed, the authorities hold that the legislation of the kind here was solely conceived to make it a crime for public custodians of public funds to make private use thereof. "The principles of the common law not being found adequate to protect general owners against the fraudulent conversion of property by persons standing in certain fiduciary relations to those who were the subject of their peculations, certain statutes have been enacted, as well in England as in this country, creating new criminal offenses and annexing to them their proper punishments. The general object of these statutes doubtless

was to define and embrace, as criminal offenses punishable by law, certain cases where, although the moral guilt was quite as great as in larceny, yet the technical objection arising from the fact of a possession lawfully acquired by the party screened him from punishment.'' 1 Bouvier, supra, p. 1005.

It is significant, I think, that the only case cited in the court's discussion of the point is *State v. Krugg,* 12 Wash. 298, 41 Pac. 126. The prosecution there was of a city treasurer—custodian of the city's funds, and a typical presentation within the very letter of the statute of Washington, and of ours. How that case could be thought to be pertinent in a prosecution of a county commissioner, member of an auditing body, powerless to act alone, and who by no stretch of interpretation of any statute is authorized to possess public funds ''by virtue of his office and pursuant to law'' is beyond my comprehension. In my opinion, the motion to quash, timely and adequately interposed by plaintiff in error, should have been granted. The point was urged as well at other appropriate occasions in the course of the trial, and should have received favorable consideration by the court. I fear the trial judge regarded the case as one of ''considerable irritation''—so designated by Marshall—but he neglected to heed Marshall's admonition to give pause lest he err.

2. Contemplating the importance the jury likely attached to the witness, Gerardi, sufficiently identified in the court opinion, I am not sure counsel for plaintiff in error was not entitled to propound the question set forth by the court here. It went to the credibility of the witness, and that is a fruitful source of inquiry on cross examination in a criminal prosecution; but assuming the question went somewhat afield, its propounding did not justify the outburst which the record shows the trial judge indulged in the presence of the jury. If, on objection of the district attorney, the judge thought the question an improper one, determination of which was well within his province, he had only to say, the objection is sustained.

Instead, and as if his personal dignity had been offended by the man on trial—not by his counsel, let it be remembered—he said: "I do not care how many crooked deals he [the witness] and the defendant here or others, may have had, so long as it does not relate to this particular transaction." I cannot think the remark was "casual," as do my associates, and harmless. The very opposite is apparent. Nor is the point answered by the observation of the court here that the judge's remark "was inspired by the attempt of defendant's own counsel to inject prejudicial matters into the record." Counsel's question to Gerardi, the basis for the court's conclusion, only contemplated the ascertainment of his conduct in a matter where his honor was important. That the question was improper does not rest in judicial certainty; and whether it was is not presented for our examination. But assuming that it was altogether improper, the fault was counsel's, not that of his client, concerning whom the judge gave utterance to damaging implications. The further statement in the opinion in relation to the same matter, that what the trial judge said was "ill advised," is not the answer due from us. It is our office to correct errors, not to complain of them.